Good morning, may it please the court. I'm Thomas Scripps, and I represent the appellant Douglas Clabaugh. The crux of the issue here is whether there was a lack of process before Mr. Clabaugh was terminated. Specifically, whether he was given a meaningful hearing. He was not given a meaningful hearing for two reasons. First, he had an attorney present, but his attorney wasn't allowed to represent him in a manner that safeguarded his interests. And second, he was given, he wasn't able to adequately prepare for the hearing because he was given materially relevant documents and recordings about five minutes before the hearing started. Okay, so let's go to that first point that you made with regard to it. So, what requires you to be able to have an attorney represent you? And what's the extent of their representation at the hearing? There are a few cases that you have to look at. I'm not aware of a case in an employment law context or a post-termination hearing that says you get representation of counsel and representation of counsel means the best. But there's a United States Supreme Court case, a Ninth Circuit case, a state of Arizona case, and a district of Nebraska case that may look together. The U.S. Supreme Court case is Goldberg v. County. That's like, that quotes the Powell v. Alpana. And it states that the right to be heard would in many cases be of no avail if it didn't complicate the right to be heard by counsel. Right, so it didn't actually give them, though in an administrative hearing, a right to have an attorney represent, cross-examine, and so forth. And in fact, in this case, the letter said that he might be able to have a representative, meaning he has a right to have a representative, may be permitted to ask questions and examine the witnesses. And he had Ms. McDonald next to him the entire time he was able to consult with her. I mean, so what's the violation of any rights that he had? He had Ms. McDonald present. So what the district court says in its opinion in the motion to present a judgment is that you're entitled to the assistance of counsel. The district court didn't address what assistance of counsel means. The district court— So you're saying he didn't have assistance of counsel at this hearing? I think he had minor assistance of counsel. I don't think he had representation of counsel as required by the law in this court. Didn't his counsel have the right to advise him throughout the hearing? She did. Didn't you? Did the counsel ever ask for the right to interrogate? She did not. I understand what the reason is, but she was there advising him during the hearing. She never asked for the right to interrogate. She says it's because they told her she couldn't. What case outlines that counsel must be allowed to conduct this cross? In Vannelli v. Arouse. This is the reason I want you to think very carefully, because we have a case, Crook. It's at 813 Fed Second at 98. It says where the assistance of counsel, without allowing counsel to address the hearing officer or conduct witness examination, is sufficient to allow the employee to present his case to his peers, then new process is afforded. If it's effective. Crook, is it? I'm not talking about effective. I'm talking is, did he allow, was he allowed to present his case to his peers? When the lawyer was asked what information she could have done differently, did she ever say anything about the hearing? She talked about more of the pre-hearing. She talked more about the list of items she would have wanted to present, right? Correct. Okay. So, was he allowed to present evidence? Was Mr. Crave allowed to present evidence? He was, Your Honor. Was he allowed to call witnesses? He was, Your Honor. Was he allowed to confront the adverse witness? He was. Was he allowed to confront the adverse evidence? He was, but some of it wasn't. But the bottom line is, I'm trying to determine whether if counsel would not be allowed to address the hearing officer and counsel would not be allowed to conduct the examination, did he nonetheless get a chance to present his case? The first question is, was counsel there advising you all the way through? Yep. Second, was he allowed to present evidence? Yep. Was he allowed to call witnesses? Yep. Was he allowed to confront the witness? Yes. Was he allowed to confront the adverse witness? Yes. All he did was he just refused to do it. So how can I suggest then that he was not allowed to present his case to his peers? He was allowed to present his case, but he doesn't know the manner in which he should present his case. And that's where the two issues come into play. Well, he had his lawyer right there at the side of him. She could have said, pass this, pass that, do this, do that. If she had read what she had with the only hire him or a hire the morning of the hearing, she would have known. She could have even done it. So you've got a lawyer there able to tell you what to do, and you're allowed to present the evidence, you're allowed to call witnesses, you're allowed to confront, but you don't, and then say they didn't get to process it. She was allowed to advise him, but there are certain documents that they didn't have until five minutes before the hearing, and those documents are particularly relevant in a case like this. The documents that were provided the last minute included four different interviews in the investigation that were conducted, audio recordings of those interviews. It also included audio recordings of two different meetings with Mr. Claywell, the command staff, and other documents that were relevant to this investigation. And the county, as anybody else, never continues. Nobody asked for a continuance, Your Honor. The county, anybody ever object? Nobody objected, Your Honor. So the lawyers there could have said, ask for a continuance. We haven't seen this till today. Ask for an object to the admission of the evidence. We haven't seen this till today. Nobody did a thing. That's correct. She was asked why she didn't object, and she said because she was only told. She was told she was only there as an observer. That doesn't say she can't get him to object. That's correct. But she was asked, and she said it's because she was told she was only there as an observer. She was told that by the sheriff who was the hearing officer and the human resources manager who were there. And if we're talking about objecting or not, then we're getting two. Is it a waiver? This is an argument that the county made, and it's supposed to be a waiver. Let me ask you a question about this Bradshers memo. Didn't they get this Bradshers memo identifying the witnesses, what they would say at least November 3rd, 15th? I agree with part of that. They got a memo. I don't know that it went into the substance of what they would say. Well, I looked at the memo. That's why I said identifying the witnesses is what they would say. I think one can reasonably argue that it says that. I don't know that I would agree, but I can't say it's just out of the question. Those witnesses all submitted to interviews. There are audio recordings of those interviews that are much more detailed than what was given to Mr. Claybaugh on November 15th. In this case, there were two underlying reasons for the determination. One is Mr. Claybaugh has the communication with a co-employee. Because of that communication, the county asked him to write a memo. He writes two different memos, and essentially in his deposition he said, I wrote three because he considered his request for interviews the third one. The issue isn't did he physically write a memo and submit that to the county. The issue is whether those memos comply with what the county asked. So when you look at that, and when you look at the he said, he said of the underlying conversation, this isn't a case where documents are going to win or lose the administrative hearing. It's a question of this individual says this, this individual said that. You need to get copies of the recordings when we do these hearings. We get all of the documents. We get recordings. We listen to them. We typically have them transcribed. We listen to them in the cross-examination of the different witnesses. Mr. Claybaugh and his counsel didn't have an opportunity to do that because those documents weren't given to him until five minutes before the hearing started. Okay, so how would he have changed his approach substantively to that hearing? He would have reviewed all of those documents. Okay, but he was confronted, right, with that information and an opportunity to ask questions at that time. Well, he was given recordings. He didn't have an opportunity to listen to those recordings before the hearing started. There were a bunch of different documents. I mean, Mr. Claybaugh's counsel at the time said she was skimming through those documents on the morning of the hearing, so he's given recordings. He has absolutely no opportunity to review those. Is there something that came up at the hearing that somehow he would have approached differently if he listened to those recordings? I mean, it wasn't sort of factually dense, right? I mean, it was pretty straightforward what they were claiming he was required to do and that he didn't do. It wasn't like there were 300 witnesses and scientific evidence was being presented. That's correct, but in the hearing between Mr. Claybaugh and Mr. Blair, who's got a sibling employee, the word Good Old Boy Network came up. There's an election for sheriff, and there's a comment about the Good Old Boy Network. Now, the real question in the administrative hearing is, was that Mr. Claybaugh's thought, or did he say this is what other people thought? And Sergeant Amon did the investigation. In the hearing, he said, I determined that Mr. Claybaugh said that. In his deposition, Mr. Amon said, I couldn't determine who said that. So there's a big distinction there. There's a lieutenant, I believe it's Lieutenant Simmons, initially recommended a 160-day suspension. That was overturned by Captain Bratcher who recommended termination. Captain Bratcher said, if there's a 99% chance that we would not have gone through with termination if he hadn't provided the memo that we asked him to provide. And what Mr. Claybaugh said is, I provided what I could provide. I can't tell them why. He played a little cute on this. He didn't want to have to tell them what he thought the Good Old Boy Network was. I don't factually agree with that. Well, he came back with a definition from Wikipedia. That's not exactly in line with what he was told. I agree with that. But at first, he was afraid to say anything about the Good Old Boy Network because he thought it would violate policies. And then he said, I don't know what policy he wanted to violate. I don't know that it would have. I think that's what his testimony was showing. I know he said that he thought it would violate. What policy did he think it would violate? I'm not taking that position. We haven't really gone down that road because I think he was inaccurate on it. That was his initial thought. He said it's hard to find that obeying a direct order to provide a memo would in itself violate some other directive that we gave him. It works off of him not doing what he was told to do. I agree with that, Your Honor. But that was the position that he was taking at that time. I was on his council at the time, and that's the reason that he initially didn't want to write the memo. And then when he wrote the memo, his position then and today is that I didn't say there was a Good Old Boy Network. I said people just said there was a Good Old Boy Network. So he submits the memo, and whether he took the proper approach to that or not is— Counselor, you're in a tough position here. I think you've handled it very, very well, very reasonably. But you're asking this court to overturn this on the basis of the new process clause of the 14th Amendment. You're asking to tell Arizona that it violated its due process rights in the way that it conducted this hearing. Did you have a statutory remedy that you have to submit to Arizona courts? You had a statute that they very clearly had ignored. No, Your Honor. That statute, the Arizona Police Officer's Bill of Rights has come up. It's a fairly recent statute in the last five or so years. It's come up often that a violation of that statute does not end up violating the law. It doesn't violate the Arizona due process clause, because, Your Honor, it's come up a few different times. And that was the issue of the briefing. It's a factor to consider, but it's not a violation of the state statute. Even that specific state statute doesn't create a federal due process violation. So, of course, it will just create a view of a state remedy. No, Your Honor. So Arizona wouldn't give you any relief then? Correct. Well, what we do is claim one part of Education v. Lowdermilk, which says the failure to comply with the state statute does not amount to a violation of federal due process. It's not an issue that I've litigated in state courts. It's an issue that I've researched. So, for one of the reasons that I haven't litigated in state courts is because they repeatedly say that there's no violation of state law. It's something we kind of talk about and scratch our heads about. There's a policy that says that you have to do this, but you don't have to comply with this. There's a case in a very similar fashion. This is an area out of Kentucky. It's Barton v. City of Glasgow. They also have an officer's bill of rights. There was a hearing there. He didn't comply with it as a bill of rights. And then the city determined, okay, we made a mistake. We didn't comply with it, and they gave him a due hearing. I've seen that come up a couple different times where you can get a due hearing, but when the agency takes in their heroes and says, we don't have to comply with that from a federal standpoint, unfortunately they're right, and I'm not aware of any state remedy there. Would you like to reserve the remainder? I would like to reserve the remainder. Thank you, Your Honor. Thank you. Mr. Korsensky. Good morning, Your Honor. May it please the Court, my name is Mike Korsensky. I'm here on behalf of the defendant of L.A. Yuma County. My answer to Your Honor's question about whether or not there was a state remedy, I think what counsel's telling you is you wouldn't plan to run that case in the state court, but there's clearly a remedy or an ability to address the statutory breach in the state court or at least to claim a case in the state court. That was the nature of the total case that's been submitted by both parties. And that is a police officer case, and counsel's right. It's a very new statute, and there's no remedy for it. I mean, this is just an obvious violation. Your people don't even know about the statute, right? That's true. They essentially didn't know. It wasn't that they knew in violation. But they could have gone back and corrected the problem. They could have gone back and corrected the problem, I believe. They could have gone back and given him a hearing that conformed to the state requirements. I'm not sure that during the whole process, or until this lawsuit was started, that they understood the process. They have so few of these hearings that, unfortunately, it's a small county with a relatively small staff and people who try their best earnestly. There was no allegation of any kind of intentional deprivation. In my district, it does say a little odd that a statute that governs termination hearings of peace officers in Arizona would not be known to the peace officers in Arizona. Are there human resources, folks? I think that while the statute was known, under the visceration of the statute, they didn't know. That was the issue. They didn't have the amendment to Section 381101B2A through C, the older version of the 18th Amendment. So did Deputy Flaybaugh have a right to have counsel representing him? He had a right to the assistance of counsel, which he received during the hearing, meaning sort of whispering in his ear, she can't stand up, she can't cross examine witnesses, she can't talk about things, make objections. There's no evidence in this case to support that factual conclusion that she wouldn't be allowed evidence, as I understand it. Well, except that she was told that she was just there as an observer, told by people she knew, and she knew there wasn't another attorney whom she had had interactions with. Ms. Americus, in her deposition, she described this, and she never approached anyone to say, hey, she didn't know about the notice because she just got it that morning and didn't realize there was discrepancy between what these people were politely saying, what's the standard practice, and when she may have been entitled to an in fact quote, you cannot use that routinely, which has allowed the attorneys to help participate. If such participation is needed, you can be able to establish a county's practice. Why did they tell her something different? Why did they tell her that she was just there as an observer? Well, they told her that, and according to the attorney, I'm trying to remember her name, and it's just based on that. I apologize to her. But according to her own testimony in this case, she wasn't told she could be an observer. She was told she could be there and she could assist. I think that's an anamorphic difference. The folks back here are observing, but they're not assisting in this presentation. Some of them I suspect are going to assist otherwise, but they're not here to help the lawyers with their presentations. We might push that number in a case, but it's not a requirement. She told that she could assist, that she could whisper in his ear, but she can't stand up and object and she can't stand up and say, okay, I've got a couple of questions I'd like to ask the witness. Well, Your Honor, that doesn't constitute a denial of due process in this case. Those statements, those polite statements, as everybody has recognized, that they don't allow or they don't like when the attorneys are taking over the hearings. If she had rather the actual ability to allow the attorneys in other hearings to ask questions, I don't want to speak outside the record. I don't think that questions asked questions relative to whether they allowed continuances on a generous basis were asked in the undisputed answer, yes. Questions about, honestly, I think the question was that, so I just don't remember what the answer was. So when was the first time that the government auntie realized that they didn't follow Arizona law, when the police officers billed rights to renegades law? I want to be careful, and I don't want to be circular. I know that answer, but I know it because I was told it. I don't think it's part of the record. Did Mr. Griffin put out the letters after 2013? Yes. I know that there's nothing in the record that suggests before they got those letters, they understood them kind of, those requirements. Did anyone respond to those letters? Yes. Mr. Griffin responded to one, and then I was brought in to assist either after the letter or shortly after the letter. There is, in the record, however, this male RICO testifying done after they received the letters, they changed their process to include the requirements for 1101B. They didn't offer it in hearing, though. They did not offer it in hearing, but I don't know a case or a statute in Arizona that would require them to do something. Under the due process clause, now, the remedy would be to have gotten a deductive hearing in state court. Did he have a due hearing? Mr. Horst, if he did, did he claim that he had been accused of driving his state vehicle under the influence? No. Yeah, he had been inducted into a hearing, and we might be a little less concerned with all of the niceties of Arizona procedure even though we're not phoned in this case. It would be pretty obvious what you do there. I did say, you know, it looks pretty thin-skinned here in this case. Respectfully, Your Honor, I think we have a couple of points relative to that question. One is we don't think that's a matter of issue. We think, oh, I understand, but it certainly provides the context for the fact that Deputy Claiborne doesn't look like he was not provided his statutory rights, and that, in general, he wasn't treated with respect to this hearing the way that we expect people to be treated. There are quite a few white rights matters in the hearing. We expect people to be given notice and an opportunity to comment on those matters. In a hearing as serious as this that relies on determination, Claiborne v. County tells us in the public welfare area we may need to afford people the opportunity to bring counsel in If they wish to have someone else assist them, surely in a termination hearing that has such great consequences for Deputy Claiborne, it wouldn't be a surprise to anybody that he might be useful to have counsel there. I will try to respond to a couple of different points I think you're understanding. I want to go back to the thin material in which the charges were brought. I made my stinging point, and I'd like to make my responsive point. In terms of, I have a harder time thinking of somebody in the public sphere, except maybe judges who are in the government sphere, who are more visible to the public than police officers and prosecutors. I can't think of people who I have more contact with those two agencies, and I can't think of an agency on a day-to-day basis, I'm heating up the military, but on a day-to-day basis, and he has to follow his own lines of reasonable command, in order to accomplish his task. I think this was very commonly contested in the sheriff's race, between Beaumont and Vanderbilt. I think that's fair, they don't know. There was a conversation between two employees in the Boulder pool, the two employees of the county, and one favored one of them, and one of them favored the other. And one of the titles of Beaumont, the deputy gets camped by, again, I'm very respectful of your honor, the disciplinary proceedings were not brought based upon the conversation. It wasn't brought because there was a conversation about how the debate, it was brought because somebody, admittedly, the only person who could have brought up the good old boy statement, was Mr. Claiborne. He was the only one. If he's a uniformed officer speaking in a uniform, having just gotten out of his car, talking to a non-uniformed employee, then there's a certain level of responsibility, part of which is to not disparage the very people who their lives and yours may depend on. As Mr. Claiborne agreed, categorically, disciplining, including termination, were appropriate, as he understood the rules under which he inquired. If he had made that statement and owned it, he was asked that question flat out. He didn't clap. He didn't waver. He said yes. If somebody, if I made that statement, good old boys, I would be subject to disciplinary opportunity, including termination. The orders that were given to him, presumed the story about the guy on the motor pool, that is, they presumed, for reference to a good old boy, was Claiborne, and not Claiborne saying, I've heard from others that there's a good old boy network. And so then he's asked to explain what the problems are with the good old boy network. That means that somebody has resolved a factual issue against him. He's been ordered to answer something that he may not have said. I may perspectively disagree with the word resolved, but it may be a starting point. Hey, we heard you said this. You know, you have to tell us what you put in the mellows. He said he didn't say it. And then they said, well, you've been subordinated because you didn't answer the question we asked you, which was to explain what the good old boy network means. Perspective, you're right. That's not correct. The first, in the first, probably the first time he was verbal, he ordered him to A, explain what happened, and B, explain what was meant by the good old boys, a word he's agreed, the term agreed, that he used in the statement. His answer was nonresponsive. There was nothing about good old boy. His written statement to Lieutenant Simmons did not contain that word or state. What eventually became his story, which is, oh, I didn't say that, or, well, I did say that, but it was in reference to what somebody else said, and I made it perfectly clear I wasn't owning that statement. If that were the case, why wouldn't he have written that the first time? Say, whoa, whoa, whoa, you guys are off on the wrong track. Yeah, I said it, but I wasn't referencing it as my statement, I was referencing it as a statement of others. I think those weighing the credibility of those excuses that come not in that first memo, but in later memos, is left to the administrative process and the administrative body. But even if you were to reevaluate that, I think you have to look at some suspicion of the evolution of his, at first, which he just blew the memo, or task, which he just blew the memo, he made the statement, and then later admission that he made it, and why he made it, or how he made it. So they have to disprove the factual predicate, because it does come up in later memos, but not in that first memo. That's why he's directed to do it again. And then the second direction that he gets, the second order he gets, he is, he doesn't write memo memo. He seems to be says, I won't do it unless I get that order in writing. Well, as an expert, and as a police officer for five years, he knows that verbal orders from demanders, and verbal orders from his superiors, and let me get this to you, a demand are to be carried out unless there is a worldly or popular reason for not doing it. He admitted as much in his deposition. Right, well, taking a demand is really important, so I don't think we're quarreling with that, but this is a pretty, it's the ultimate disciplinary action, which is termination. And so that's the whole issue, is that you have this termination hearing, you know, he's, it's obviously, you know, a consequence of terrible things that's happened. He's not given all of the documents to write before. He gets a last minute replacement with whoever's going to represent him in the hearing. That person, Ms. McDonald was told she's to be an observer, and so forth. So, yes, and then later on, you know, the county finds out, well, he didn't follow Arizona law at that point. You know, why isn't he given a new hearing? I mean, why are we even here on a federal due process claim when there's a state law that he could have raised? And like you said, you know, maybe he should have gone for his job differently, or what have you. But that's why, why doesn't the county do this, especially over something as important as chain of command is? Over a stupid statement that went out of interest, was attributed directly to Mr. Clay Howard. Have you ever admitted that he said it? You know, your answer, your honor, my answer's going to sound trite. I don't want to. I'm going to give you my answer and then the explanation. Because they weren't asked how that's important contextually, because the letters they got from counsel were saying, you didn't give him a post-deprivation hearing. Not that you gave him one, and there was a failure in it that came up later in the course of things. So I suspect I wasn't there. I can't answer. The question wasn't asked in this case. But I think it's, there's no evidence that it was out of malice or any desire to uphold a process that they had in court in accordance with due process. So I think it's easy in hindsight to say, hey, why don't you just turn around and realize you didn't give him a due process and we can do it at some point later. Well, they requested, they reviewed the matter personally to Arizona Law Section 38-1101-K. Right. Those procedures, as Judge Collin correctly pointed out, apply to post-deprivation matters. What was being argued or a plea was in the letters from counsel was, hey, we need a post-deprivation hearing. We want a post-deprivation hearing. And we want it conducted by these rules. Well, if this was a pre-deprivation hearing as was counsel's position in those letters of plea, then counsel can answer that they shouldn't be doing that part. But at least I understood it to be, if this was a, I'm out of time, I don't know what happened. I don't think there are any further questions. Thank you. Thank you very much. It was really good. Thank you. Regarding the follow-up request for a hearing, the hearing was on November 30th. On December 7th of 2012, the determination became effective. In ER 265, on December 17th of 2012, my firm sent a letter to Yuma County requesting a hearing. It was a fairly brief letter, and it's in pursuant to ARS 38-1101-T1. Ten days later, an attorney for the county, Bill Kirkus, contacted me via telephone. We had a communication about what our request was and the specifics of 1101. He said he'd get back to me. He didn't get back to me. On February 13th of 2013, in ER 263 and 264, is a more detailed letter from me addressing 1501, why the initial hearing, if it was a post-termination hearing, was deficient. It concluded by asking the county that if they believe that it complied with the Police Officer's Bill of Rights, where it doesn't have to comply to provide me any documents, or if there were any on that. We never heard anything back. We had no choice but to file a lawsuit on that.  I did not, Your Honor. My friend did, the lawyer. She was asked what she would have done differently if she'd had the chance to see the notice before, and the only thing she said was she would have offered the list of additional items she would have wanted to present. Did she ever offer those? She did not, Your Honor. In her deposition, she testified that she believed that it was a pre-termination hearing, and I believe that's the reason that she didn't offer anything else. Toshi Grigley won the representation of counsel. I think it's important. This Court's decision in Benelli v. Reynolds School District, it's an employment context case. It's a post-termination case. In that opinion, this Court cited Zuckerberg regarding the opportunity to be heard there. It was determined that the post-termination hearing was sufficient, and one of the specifically listed factors was that Mr. Benelli had an attorney. He was able to represent you in that hearing. He was able to cross-examine all the witnesses who were presented. Not one witness wasn't there. And in Goldberg, there's a list of things that counsel can do. They can help delineate the issues. They can present the factual contentions in an orally manner, conduct cross-examination, and generally safeguard the interests of the recipient. Goldberg has been brought into the employment law context in Benelli, and that was not an opportunity here. Thank you. Thank you. Thank all counsel for the argument. I play ball with the security of humans. Order submitted.
judges: Bybee, N.R. Smith, Kobayashi